## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JOHNEL A. LOVE,
     Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:15-cv-408
Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

    Plaintiff Johnel A. Love brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security ("Commissioner") denying

plaintiff's application for disability insurance benefits ("DIB"). This matter is before the Court

on plaintiff's statement of errors (Doc. 8), the Commissioner's response in opposition (Doc. 13),

and plaintiff's reply memorandum (Doc. 15).

### I. Procedural Background

    Plaintiff filed his application for DIB in May 2011, alleging disability since March 31,

2007 due to a neck injury, depression, and nerve damage, numbness, and pain of the neck and

left upper extremity. The application was denied initially and upon reconsideration. Plaintiff,

through counsel, requested and was granted a hearing before administrative law judge ("ALJ")

Peter J. Boylan. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ

hearing. On January 2, 2015, the ALJ issued a decision denying plaintiff's DIB application.

Plaintiff's request for review by the Appeals Council was denied, making the ALJ's decision the

final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The impairment must render the claimant unable to engage in the work previously performed or

in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §

423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or
mental impairment – *i.e.*, an impairment that significantly limits his or her
physical or mental ability to do basic work activities – the claimant is not
disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the
listings in Appendix 1 to Subpart P of the regulations and meets the duration
requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her
past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not
disabled. If the claimant cannot make an adjustment to other work, the claimant
is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

2

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] last met the insured status requirements of the Social Security Act on June 30, 2012.
>
> 2. The [plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of March 31, 2007 through his date last insured of June 30, 2012 (20 CFR 404.1571 *et seq.*).
>
> 3. Through the date last insured, the [plaintiff] had the following severe impairments: cervical spondylosis and degenerative disc disease (s/p ACDF at C6-C7 in April 2008), degenerative joint disease in the left shoulder, depressive disorder, and polysubstance abuse (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the [plaintiff] had the residual functional capacity [("RFC")] to perform light work as defined at 20 CFR 404.1567(b) except that his use of the (dominant) left upper extremity was limited to occasional pushing/pulling, occasional overhead reaching, frequent front and lateral reaching, and frequent handling, fingering and feeling; he could never crawl and never climb ladders, ropes or scaffolds; he could frequently climb ramps or stairs, balance, stoop, kneel, and crouch; and he needed to avoid all exposure to workplace hazards. The [plaintiff] was limited to performing simple, routine and repetitive tasks; he was not able to perform at a production rate pace (e.g., assembly line work) but could perform goal oriented work (e.g., office cleaner); he was limited to making simple work-related decisions; he could have frequent, superficial interaction with supervisors and coworkers, but no interaction with the public as part of his job duties; and he was limited to tolerating occasional changes in a routine work setting.

6. Through the date last insured, the [plaintiff] was unable to perform any past relevant work (20 CFR 404.1565).[1]

7. Born [in] 1968, the [plaintiff] was 44 years old, which is defined as a "younger individual age 18-49," on the date last insured (20 CFR 404.1563).

8. The [plaintiff] has a tenth grade or "limited" education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] was "not disabled," whether or not he had transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the [plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could have performed (20 CFR 404.1569 and 404.1569(a)).[2]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from March 31, 2007, the alleged onset date, through June 30, 2012, the date last insured (20 CFR 404.1520(g)).

(Tr. 16-29).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[1] Plaintiff's past relevant work was as a cook, a light exertion, semiskilled position; warehouse loader and galvanizer, both medium exertion, unskilled positions; molder, a medium exertion, semiskilled position; and assembler, a light exertion, unskilled position. (Tr. 28, 778-79).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative unskilled light occupations such as packager (200 jobs locally, 200,000 jobs nationally), housekeeping cleaner (1,000 jobs locally, 300,000 jobs nationally), and machine tender (250 jobs locally, 250,000 jobs nationally). (Tr. 29, 805).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff argues the ALJ's RFC formulation is an unreasonable interpretation of and unsupported by the evidence of record. Next, plaintiff contends the ALJ erred by failing to give controlling, or at least substantial, weight to the opinion of plaintiff's treating physician, Dr. Carl Shapiro, D.O. Finally, plaintiff argues the ALJ improperly found that plaintiff was not entirely credible. (Doc. 8).

**1. Substantial evidence supports the ALJ's decision to not give controlling weight to the treating physician's opinion.**

Whether the ALJ properly weighed Dr. Shapiro's medical opinion directly impacts whether the ALJ properly evaluated plaintiff's RFC. Thus, the Court will first consider plaintiff's assignment of error concerning Dr. Shapiro's opinion.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and

extent of the treatment relationship and the frequency of examination. 20 C.F.R. §
404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical
specialty of the source, how well-supported by evidence the opinion is, how consistent the
opinion is with the record as a whole, and other factors which tend to support or contradict the
opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always
give good reasons in [the] notice of determination or decision for the weight [given a] treating
source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544
(ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion).
Those reasons must be "supported by the evidence in the case record, and must be sufficiently
specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating
source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR
96-2p, 1996 WL 374188 at *5 (1996)). This procedural requirement "ensures that the ALJ
applies the treating physician rule and permits meaningful review of the ALJ's application of the
rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

In April 2008, plaintiff had anterior cervical discectomy and fusion (a surgery to remove
a herniated or degenerative disk in the neck area of the spine) at C6-C7. (Tr. 590). An
electromyogram ("EMG") in May 2007 revealed a C7 radiculopathy on the left. (Tr. 235, 590).
An MRI of the cervical spine from May 2007 revealed multilevel degenerative disc disease,
including a moderate diffuse posterior disc bulge at C6-C7 resulting in severe left foraminal
narrowing, moderate diffuse posterior disc bulges at C4-C5 and C5-C6, a focal right paracentral
disc bulge at C3-C4, central canal stenosis from C3 through C7, and bilateral foraminal
narrowing at C4 through C6. (Tr. 236-37, 590).

Following his surgery, plaintiff began treating with Dr. Shapiro, a specialist in physical medicine and rehabilitation, on October 6, 2008. (Tr. 590). Dr. Shapiro noted that plaintiff presented with neck pain, left shoulder pain, and left arm pain with numbness in digits 1, 2, and 3. Plaintiff reported that his pain was "worse with any lifting, bending, or twisting, or when sitting too long." (*Id.*). On October 13, 2008, Dr. Shapiro noted that plaintiff had some neck pain and stiffness. (Tr. 589). X-rays of plaintiff's cervical spine showed "good alignment." (*Id.*). Plaintiff "had somatic dysfunction found by range of motion asymmetries, tender points, and textural changes on osteopathic structural examination." (*Id.*). Dr. Shapiro treated plaintiff with "facilitated positional release, muscle energy, and high velocity," which restored plaintiff's range of motion. (*Id.*). However, plaintiff "still had quite a bit of pain." (*Id.*).

On October 20, 2008, Dr. Shapiro noted that plaintiff was "still having some neck pain and guarding." (Tr. 588). Dr. Shapiro again noted "somatic dysfunction found by range of motion asymmetries, tender points, and textural changes on osteopathic structural examination." (*Id.*).

On November 3, 2008, Dr. Shapiro noted that plaintiff was "still having neck pain and shoulder pain on the left." (Tr. 587). Plaintiff also had "positive impingement test on physical examination." (*Id.*). Dr. Shapiro indicated that plaintiff "still ha[d] some minor weakness in the left arm, and he ha[d] pain very easily provoked with maneuvers." (*Id.*). Dr. Shapiro ordered an MRI of plaintiff's left shoulder. Dr. Shapiro again noted "somatic dysfunction found by range of motion asymmetries, tender points, and textural changes on osteopathic structural examination." (*Id.*).

On November 24, 2008, Dr. Shapiro noted that X-rays of the neck showed an intact C6-C7 fusion and the MRI of plaintiff's left shoulder was "essentially unremarkable." (Tr. 586). However, plaintiff had "a lot of infrascapular pain." (*Id.*). Dr. Shapiro again noted "somatic

8

dysfunction found by range of motion, symmetries, tender points, and textural changes on osteopathic structural examination." (*Id.*).

In February 2009, Dr. Shapiro noted that plaintiff was "still having a lot of difficulty with his shoulder" and had "clear signs of impingement on the left shoulder." (Tr. 585). Dr. Shapiro opined that plaintiff would not reach maximum medical improvement until his shoulder issue was addressed. (*Id.*).

In March 2009, Dr. Shapiro noted that plaintiff was "having some refractory neck pain and some scapular pain and he [had] a positive impingement sign on the left [shoulder]." (Tr. 584). In April 2009, Dr. Shapiro opined that plaintiff was "fairly stable" neurologically and "the pain generator really [was] his shoulder." (Tr. 583). In May 2009, Dr. Shapiro noted that plaintiff had some neck pain, neck stiffness, and some shoulder pain. (Tr. 582). In June 2009, Dr. Shapiro noted that plaintiff was "still having ongoing difficulties." (Tr. 581). In July 2009, Dr. Shapiro noted that he was continuing to treat plaintiff with only prescription medication pending approval of plaintiff's Worker's Compensation claim as to his left shoulder. (*See* Tr. 579-80).

In August 2009, Dr. Shapiro noted that plaintiff had "a lot of neck pain and stiffness" and "[h]is shoulder [was] also killing him." (Tr. 578). Dr. Shapiro noted "somatic dysfunction as found by range of motion asymmetries, tender points, and textural changes on osteopathic structural examination." (*Id.*). Dr. Shapiro also noted that plaintiff was "quite frustrated and quite depressed" over his condition and the delay in its resolution. (*Id.*).

In September 2009, Dr. Shapiro noted that plaintiff was "clinically stable." (Tr. 577). Dr. Shapiro "treated [plaintiff] at the cervical and thoracic spine for somatic dysfunction as found by range of motion asymmetries, tender points, and textural changes on osteopathic structural examination." (*Id.*). At appointments in October, November, and December 2009, Dr.

Shapiro noted that plaintiff was neurologically and clinically stable but still experiencing persistent shoulder pain.  (*See* Tr. 574-76).

In January 2010, Dr. Shapiro noted that plaintiff was still having a lot of neck and shoulder pain.  (Tr. 573).  Further, plaintiff "developed a lot of stiffness in his neck and shoulder" after doing "some mild exercises with just 10-pound weights."  (*Id.*).

In March 2010, Dr. Shapiro noted that plaintiff was "having some left upper extremity numbness and tingling" and "a lot of refractory pain in his left arm."  (Tr. 571-72).  Dr. Shapiro ordered an EMG of the ulnar nerve to "see whether this is ulnar difficulties or part of his cervical radiculopathy."  (Tr. 572).  The EMG was performed in April 2010 and revealed an age indeterminate C5-C6 radiculopathy on the left.  (Tr. 568-69).  Dr. Shapiro noted ongoing neck and shoulder pain at appointments in May 2010.  (Tr. 566-67).

In June 2010, Dr. Shapiro noted that plaintiff was working part-time in a warehouse and his shoulders and neck were bothering him on both sides.  (Tr. 565).  Dr. Shapiro indicated that plaintiff's neck surgery had resulted in "fairly good results, in terms of neurologic outcome, but he ha[d] a lot of musculoskeletal pain."  (*Id.*).  In July 2010, plaintiff's pains were "usually the same and stable."  (Tr. 564).  In August 2010, Dr. Shapiro noted that plaintiff was working part-time but "still having some difficulties with his neck and shoulder."  (Tr. 563).

In October 2010, Dr. Shapiro noted the following:

> He is having pain down his left arm.  He has been doing some temporary [work] with a lot of repetitive twisting and lifting at the same time.  It is not that it is the high weight, it is just the repetitive action seems to flare his spondylosis.  He gets varied numbness and tingling into the index finger, which is consistent with his problems at C6-7.  All in all he seems neurologically stable.  He still has good grip strength.

(Tr. 562).  On December 2, 2010, Dr. Shapiro noted that plaintiff was having pain in his neck, thoracic spine, upper lumbar spine, and shoulder, but was clinically stable.  (Tr. 561).  On

December 30, 2010, Dr. Shapiro noted that plaintiff had involuntary guarding and stiffness in his neck, shoulder girdle, and thoracolumbar junction. (Tr. 560).

In January 2011, Dr. Shapiro noted that plaintiff consistently had refractory neck and shoulder pain with occasional low back pain. (Tr. 559). Further, plaintiff was "having quite a bit of anxiety and discomfort." (*Id.*). Dr. Shapiro started plaintiff on Xanax for anxiety and renewed his pain medications. (*Id.*).

In February 2011, Dr. Shapiro noted pain in plaintiff's "left arm radiating down to his fingertips with twitching, numbness, and tingling." (Tr. 558). Plaintiff also had bilateral neck pain. Plaintiff's pain medication "decrease[d] the pain from 6/10 to 7/10 down to 4/10 on the severity scale." (*Id.*).

In March 2011, plaintiff was seen by Dr. Shapiro and Debra Pogue, a nurse practitioner in Dr. Shapiro's practice. (Tr. 557). Plaintiff had constant pain "in his neck and back, etc.," which he rated "at the usual 7/10." (*Id.*). In May 2011, Ms. Pogue noted that plaintiff had pain in his neck and back that he rated at 7/10. (Tr. 556). Further, it "hurt to turn his neck from side to side but these [were] not new symptoms." (*Id.*). Plaintiff reported that pain medication made his pain "tolerable." (*Id.*).

In June 2011, Ms. Pogue noted that plaintiff had pain that he rated as 5.5/10, which he considered "tolerable." (Tr. 555). He was "having neck pain that radiate[d] down his left arm into his left thumb and the next two digits (the index and middle fingers)." (*Id.*). Plaintiff had 5/5 muscle strength in his arms, intact sensation in his right hand, strong, equal hand grasps bilaterally, and decreased sensation in his left hand in the first three fingers. (*Id.*).

In July 2011, Ms. Pogue noted that plaintiff had "the same pain symptoms in his neck and shoulders radiating down into his fingers bilaterally." (Tr. 554). Plaintiff rated his pain at 8/10 but indicated that medication reduced his pain to 3/10 to 5/10. (*Id.*). In September 2011, Ms.

11

Pogue noted that plaintiff was having "a lot more neck stiffness, especially when he attempts to turn his neck to the left." (Tr. 552). Plaintiff also continued to have left index finger numbness. Plaintiff's prescriptions were renewed and diclofenac was added for inflammation. (*Id.*).

In October 2011, plaintiff reported to Ms. Pogue that his "pain medications work really well to help control his pain and when he is on his medication, his pain level is between 1-2/10 scale." (Tr. 551). Plaintiff denied any type of physical side effects from his medications. (*Id.*). In November 2011, Ms. Pogue noted that plaintiff had been working in a warehouse for two months, but the repetitive work with his arms made it "hard for him to get his pain under control after working all day long." (*Id.*). In December 2011, Ms. Pogue noted that plaintiff's pain had flared up after he tried to increase his activity level by working out. (Tr. 549). Plaintiff was prescribed an increased dosage of Percocet. (*Id.*).

In January 2012, plaintiff rated his pain at 8/10, which he said was "good for him." (Tr. 548). He reported that the pain was tolerable, especially on his current medications to where he can function on a daily basis. (*Id.*). In February 2012, plaintiff rated his pain at 9/10 and described it as "a persistent, dull ache all over, especially on the left side of his neck and down his arm" with intermittent numbness and tingling in his hand. (Tr. 547). Plaintiff's condition was unchanged at appointments in March and April 2012. (Tr. 545-46). In May 2012, Ms. Pogue noted that plaintiff was having pain in his neck, shoulders, and left arm, which he rated at 7/10. (Tr. 544). Plaintiff also had right hand pain, which was "new for him." (*Id.*). In June 2012, Ms. Pogue noted that plaintiff rated his pain at 9/10. (Tr. 543). He continued to be physically active with yardwork and reported his pain medications help control the pain so he can function on a daily basis. (*Id.*).

Dr. Shapiro and Ms. Pogue continued to see plaintiff on a monthly basis after his date last insured. (*See* Tr. 517-42). In November 2012, plaintiff reported that he had recently been "more

12

physically active, picking up odd jobs such as painting," but he continued to have neck pain radiating down his left arm. (Tr. 538). Plaintiff continued reporting no medication side effects and that his pain medications help control his pain to where he can function on a daily basis. (*Id.*). His gait and station continued to be normal, balance and coordination were intact, deep tendon reflexes were symmetrical, and motor and sensory examinations were also normal. (*Id.*). In January 2013, Ms. Pogue noted that plaintiff "landed on his right shoulder and has had pain ever since" after having "a scuffle with his nephew." (Tr. 536). In July 2013, Ms. Pogue noted that plaintiff had fallen during a seizure and dislocated his right shoulder. (Tr. 524). In August 2013, Dr. Shapiro noted that plaintiff's seizure was caused by Xanax withdrawal. (Tr. 523). Plaintiff's Xanax prescription had been switched "from generic to proprietary because of a difference in side effects, [but] the cost prohibited him [from] filling the prescription." (*Id.*). In January 2014, Dr. Shapiro noted that "at this point he really just is not going to be competitive in the work world." (Tr. 517).

 In May 2014, Dr. Shapiro completed a medical report for disability purposes. (Tr. 678-83). Dr. Shapiro noted that plaintiff's "care was delayed throughout 2008 and 2009" because his case was a worker's compensation claim. (Tr. 679). Dr. Shapiro indicated that during this period, plaintiff's "pain became rather progressive and he was occasionally finishing up his medications before they were coming due." (*Id.*). Dr. Shapiro noted that plaintiff's "major complaints always seem[ed] referable to the shoulder" and stated "quite emphatically that adjacent-level disease is very common in the setting of spine surgery." (Tr. 679-80). Dr. Shapiro further opined:

> This is not unusual. The mechanisms for this are thought to be due to postural aberrations secondary to the fusion constructs either above or below the new level, which creates force vectors that accelerate degenerative spondylosis and disk rupture. I also want to note that the pain patterns that [plaintiff] was

13

experiencing, especially in the shoulder, could very well have been related to cervical disk disease at C5-C6 and/or C6-C7.

(Tr. 680).

Dr. Shapiro opined:

By May 2011, it became pretty evident to me that [plaintiff] was never going to return to the competitive workplace. The reasoning for this was persistent pain, persistent neurological deficits, inability to control his pain actively, and the fact that he really has only been trained to do fairly physical work.

(*Id.*). Dr. Shapiro indicated that during the relevant period, plaintiff consistently reported pain levels "in the area of 5/10 to 6/10 as a baseline, and 8/10 to 10/10 when flared, but also, occasionally down as low as 3/10. Most of this was activity related." (*Id.*). Dr. Shapiro indicated that "[c]linical findings in the cervical spine include crepitus, tenderness, muscle spasm, weakness in the arm, some chronic fatigue, some sensory loss which is more subjective than objective, and motor loss." (Tr. 681). Additionally, plaintiff had "decreased reflexes in the triceps and reduced grip strength" as well as "limitations of motion with regard to his arms with abduction above 90 to 110 degrees on the right especially, and also, with neck rotation, especially when he is overtly symptomatic." (*Id.*).

Dr. Shapiro opined that when plaintiff is having a flare-up, "he has left and right rotational deficits [of the cervical spine] of greater than 50%." (*Id.*). Dr. Shapiro stated:

This can usually be redressed with osteopathic manipulation which temporises his symptoms but he flares easily with overuse. His neck is a chronic focus of irritation, most likely secondary to cervical spondylosis, and degenerative disk disease. He has severe headaches when he becomes overtly symptomatic. Usually these are occipital and then they generalize over the temporoparietal region.

(*Id.*). Dr. Shapiro indicated that plaintiff had impaired sleep, malaise, and headaches three to four times a week lasting several hours to several days. (*Id.*).

Dr. Shapiro offered the following opinion concerning plaintiff's functional limitations:

14

[Plaintiff] does not have any real difficulty with walking. Sitting is sometimes problematic, especially if he has to sit and focus at a task. He can manage one to two hours, I think. Prolonged standing can be an issue for him, especially if there is any overhead work, or work at the level [of] his shoulders or above. I think he would need to change positions approximately every one and a half to two hours. I think one of the difficulties he would have at work is that he cannot do much above the level of his shoulders comfortably, and he gets persistent headaches from his neck pain. I think he would need to take unscheduled breaks during the working day, at least two to three times a day, and I think this would be a persistent issue for him. I do not know whether or not he would have to lie down, but he would certainly have to disengage from any physical activity that he was doing for probably a half hour or so in order to recoup.

(Tr. 682). Dr. Shapiro further opined:

I would say that for [plaintiff] to do any work overhead is really going to be a burden for him with more than a single, solitary lift with even fewer than 10 lbs., but this is a physically strong man who probably could work between the level of his waist to his shoulders fairly comfortably with 10 to 20 lbs. if the weight could be supported and if he had good ergonomics. I do not think he would be able to do this on a competitive basis, however. I think he would fatigue and his neck and shoulder pain would be an issue.

(*Id.*). Dr. Shapiro further opined:

Looking down, head turning, and looking up are all problematic for him, and holding his head in a static position would again be problematic for him. I would say he would be doing this occasionally with success, but not on an ongoing basis. Twisting, stooping, crouch[ing], and climbing ladders and stairs are just not reasonable for him at all. Reaching, handling, and fingering would impose limitations with reaching. In terms of the percentage of time he could do any overhead lifting or reaching in front of his body, I would say this would be minimal and not at all on a continuous basis. Iteratively, he might be able to accomplish this. He is a physically strong man and I do not know what the limitations are in grasping, turning, or twisting objects. Fine manipulation is somewhat problematic in the left hand because he has impaired sensation, at least subjectively.

(*Id.*). Dr. Shapiro believed that plaintiff "would be off task roughly 20% to 25% of the day

minimally." (*Id.*). Further, plaintiff "would not be able to work at a competitive level even on

his best days" and on bad days, plaintiff "would miss well over four to five days per month due

to fatigue, exhaustion, and chronic pain." (*Id.*).

The ALJ found that Dr. Shapiro's opinion "is not well supported by acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the case record." (Tr. 23). The ALJ found that Dr. Shapiro's functional assessment was "flawed" because it was produced almost two years after plaintiff's date last insured and considered impairments that were not present at that time, including injuries to plaintiff's right shoulder that occurred in January and March 2013. (*Id.*). The ALJ asserted that Dr. Shapiro's opinion included clinical findings such as crepitus, weakness, motor loss, and reduced grip strength "that were not documented in his own treatment notes at that time." (Tr. 23-24). The ALJ concluded that "Dr. Shapiro's references to 'chronic fatigue' and 'exhaustion' as a rationale for taking unscheduled breaks and missing work is clearly based on [plaintiff's] self-report." (Tr. 24). The ALJ found that Dr. Shapiro's belief that chronic pain would also contribute to workplace absences "seems inconsistent with [plaintiff's] repeated statements to Ms. Pogue that prescribed medication made his pain tolerable and improved his daily functioning." (*Id.*). Further, the ALJ found that the functional limitations in Dr. Shapiro's opinion were not supported by objective evidence, noting that the cervical X-rays "in November 2008 showed an intact C6-C7 fusion and an MRI of the left shoulder ordered that month . . . was 'essentially unremarkable.'" (*Id.*). The ALJ asserted that while the April 2010 EMG showed a C5-C6 radiculopathy on the left, "Dr. Shapiro does not appear to have taken it seriously because he never referred [plaintiff] for a neurosurgical consultation based on that finding." (*Id.*). For these reasons, the ALJ concluded that Dr. Shapiro's opinion was not entitled to controlling weight. (*Id.*).

Moreover, after weighing the regulatory factors, the ALJ gave Dr. Shapiro's opinion "little weight overall." (Tr. 25). The ALJ found that while Dr. Shapiro treated plaintiff on a monthly basis since October 2008, after June 2011 most of the examinations in his office were conducted by Ms. Pogue whose clinical findings "are more specific" and "do not support the

16

limitations he proposes." (*Id.*). As to the nature and extent of the treatment relationship, the ALJ

determined that Dr. Shapiro's treatment was limited to osteopathic manipulations, pain medicine,

and muscle relaxants, noting that he "did not refer [plaintiff] for physical therapy or injections to

his left shoulder and did not recommend any interventional treatments (e.g., epidural steroid

injections, nerve blocks) for his neck." (*Id.*). As to supportability and consistency, the ALJ

found that while Dr. Shapiro cited some clinical findings to support the limitations he

recommended, those findings "were not spelled out in his treatment notes before [plaintiff's] date

last insured." (*Id.*). As to specialization, the ALJ found that Dr. Shapiro's specialization in

physical medicine and rehabilitation was "not compelling as he is neither an orthopedic specialist

nor a neurosurgeon." (Tr. 26). The ALJ also found that Dr. Shapiro appeared "to rely to a great

extent on [plaintiff's] self-reported symptoms" and "improperly assume[d] the role of a

vocational expert by asserting that [plaintiff's] lack of vocational training and education would

prevent him from functioning in the competitive workplace." (*Id.*).

Plaintiff argues the ALJ erred by giving "little weight" to Dr. Shapiro's opinion. (Doc. 8

at 11). Plaintiff asserts that contrary to the ALJ's finding, Dr. Shapiro noted right shoulder pain

as early as December 2010 and did not rely heavily on plaintiff's right shoulder problems in

forming his opinion as he opined that plaintiff was already disabled by May 2011 before his right

shoulder problems became a factor. (*Id.* at 11-12). Plaintiff contends that contrary to the ALJ's

finding, Dr. Shapiro's opinion was supported by "plenty of objective findings" in his progress

notes and objective tests. (*Id.* at 12). Plaintiff argues that Dr. Shapiro's opinion concerning

fatigue was supported by substantial medical evidence. (*Id.* at 12-13). Plaintiff contends the

ALJ improperly weighed the regulatory factors. (*Id.* at 14-15).

The Commissioner responds that the ALJ reasonably gave little weight to Dr. Shapiro's

opinion because "the final responsibility for deciding the issue of disability is 'reserved to the

17

Commissioner.'" (Doc. 13 at 9-10). The Commissioner argues the ALJ reasonably discounted

Dr. Shapiro's opinion because it was authored 23 months after plaintiff's date last insured. (*Id.*

at 11-12). The Commissioner contends that Dr. Shapiro's opinion contradicted the

"unremarkable findings" in his treatment notes. (*Id.* at 12-13). The Commissioner argues the

ALJ properly rejected Dr. Shapiro's opinion to the extent it was based on plaintiff's self-reports.

(*Id.* at 13-14). The Commissioner contends that Ms. Pogue's findings were "essentially

unremarkable" and did not support Dr. Shapiro's opinion. (*Id.* at 14-15). The Commissioner

argues that Dr. Shapiro's "so-called objective evidence" concerning range of motion

asymmetries, tender points, and textural changes "lacked any specifics or quantitative

measurements." (*Id.* at 15). The Commissioner contends that Dr. Shapiro's "limited" treatment

of plaintiff consisting of medication and osteopathic manipulations "does not suggest the

extreme limitations Dr. Shapiro opined." (*Id.*).

In reply, plaintiff contends that Dr. Shapiro's opinion was not conclusory, but "listed

specific functional limitations which he believed caused Plaintiff to be fully disabled." (Doc. 15

at 2). Plaintiff argues that the Commissioner has failed to address any of the many positive

findings in Dr. Shapiro's progress notes. (*Id.*). Plaintiff contends that although Dr. Shapiro

wrote his opinion after plaintiff's date last insured, he began treating plaintiff in 2008 and

"specifically stated that the limitations he was listing in his 2014 opinion were applicable from as

early as when he began treating Plaintiff." (*Id.* at 2-3). Plaintiff argues that the ALJ cherry-

picked "only a few general progress notes which are not significant, while ignoring the numerous

other progress notes and test results from throughout the years which document positive

objective findings that do support Dr. Shapiro's opinions." (*Id.* at 4). Plaintiff contends that Ms.

Pogue's observations that pain medication made plaintiff's pain tolerable when he was not

working is not inconsistent with Dr. Shapiro's opinion because the progress notes also document

18

that when plaintiff attempted to work, "his pain became exacerbated and he was far less able to function." (*Id.* at 5). Plaintiff argues the record makes clear that the reason Dr. Shapiro did not refer plaintiff for surgery, physical therapy, or a more intense course of treatment was because "there were difficulties with getting the Bureau of Workers Compensation to approve such further treatment." (*Id.* at 6).

*Substantial evidence supports the ALJ's decision to not give Dr. Shapiro's opinion controlling weight*

The ALJ's decision to not give controlling weight to Dr. Shapiro's opinion is supported by substantial evidence in the record and the ALJ provided "good reasons" for discounting the treating physician's medical opinion. *See Cole*, 661 F.3d at 937. First, the ALJ reasonably discounted Dr. Shapiro's opinion because it was produced almost two years after plaintiff's date last insured and considered impairments that were not present at that time, including injuries to plaintiff's right shoulder that occurred in January and March 2013. (Tr. 23). To obtain DIB benefits, plaintiff must establish that the "onset of disability" was prior to June 30, 2012, the date his insured status expired, and that his disability lasted for a continuous period of twelve months. 42 U.S.C. § 423(a), (c), (d)(1)(A). *See Smith v. Comm'r of Soc. Sec.*, 202 F.3d 270 (6th Cir. 1999) (citing *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). Post-insured status evidence of new developments in a claimant's condition is generally not relevant. *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981). Such evidence may be examined, however, when it establishes that the impairment existed continuously and in the same degree from the date plaintiff's insured status terminated. *See Johnson v. Sec'y of H.E.W.*, 679 F.2d 605 (6th Cir. 1982). *See also King v. Sec'y of HHS*, 896 F.2d 204, 205-06 (6th Cir. 1990) (post-expiration evidence may be considered, but it must relate back to plaintiff's condition prior to the expiration of date last insured).

19

Plaintiff's insured status expired in June 2012, but Dr. Shapiro did not write his opinion until May 2014. In that opinion, Dr. Shapiro assessed some functional limitations arising from plaintiff's various impairments, but his opinion did not clearly distinguish between plaintiff's functional limitations before and after his date last insured. (*See* Tr. 680-81). For example, it is not clear from Dr. Shapiro's opinion whether plaintiff had the same limitations with overhead reaching before his insured status lapsed in June 2012, given Dr. Shapiro's report that plaintiff's right shoulder "had not been previously problematic" before January 2013. (Tr. 680). Dr. Shapiro failed to specify whether the particular limitations he assessed in May 2014 were also present prior to June 30, 2012, the date plaintiff's insured status expired. The ALJ reasonably considered this factor in deciding not to give controlling weight to Dr. Shapiro's opinion.

Second, the ALJ reasonably found that Dr. Shapiro's May 2014 opinion included clinical findings such as crepitus, weakness, motor loss, reduced grip strength, exhaustion, and chronic fatigue that were not documented in his own treatment notes. (Tr. 23-24). *See Gayheart*, 710 F.3d at 376. Dr. Shapiro's treatment notes from the relevant time period are devoid of any references to crepitus, motor loss, reduced grip strength, exhaustion, or chronic fatigue. (*See generally* Tr. 543-90). The ALJ reasonably concluded that Dr. Shapiro's opinion relating to fatigue and exhaustion was based on plaintiff's subjective reports, which the ALJ did not fully credit, because there were no references to chronic fatigue and exhaustion in Dr. Shapiro's progress notes. Additionally, Dr. Shapiro's notes do not support his May 2014 opinion that plaintiff suffered from reduced grip strength. In October 2010, Dr. Shapiro noted that plaintiff "still has good grip strength." (Tr. 562). Ms. Pogue also noted that plaintiff had "strong, equal hand grasps bilaterally" from June 2011 until plaintiff's date last insured. (*See* Tr. 544-46, 549-50, 552-53, 555). Finally, while Dr. Shapiro referenced weakness in the left arm in November

2008, he characterized it as "minor." (Tr. 587).[3] Likewise, Ms. Pogue noted that plaintiff had 5/5 strength in his arms in June 2011, and in September 2011 and March 2012 she noted plaintiff had equal muscle strength in his arms. (Tr. 546, 552, 555). Further, Ms. Pogue noted that plaintiff's deep tendon reflexes were symmetrical on numerous occasions. (*See* Tr. 549-50, 552, 554). Notably, on June 11, 2012, at his last examination just prior to the expiration of his insured status, plaintiff was alert, oriented, cooperative and in no acute distress; his gait and station were normal; his balance and coordination were intact; his deep tendon reflexes were symmetrical; his motor and sensory examinations were normal; and his hand grasps bilaterally were equal and strong. (Tr. 543). Because Dr. Shapiro's May 2014 opinion cited numerous clinical findings that were not actually documented in his or Ms. Pogues' treatment notes, and in some respects was directly contradicted by the treating sources' progress notes, the ALJ's reason for declining to give controlling weight to Dr. Shapiro's opinion is a "good reason" supported by substantial evidence in the record.

The ALJ also reasonably determined that Dr. Shapiro's opinion that chronic pain would contribute to workplace absences was inconsistent with plaintiff's reports of the effectiveness of his pain medication on his pain level and ability to function. (Tr. 24). Prior to the expiration of plaintiff's date last insured, plaintiff reported to Dr. Shapiro and Ms. Pogue that his pain medication consistently decreased his pain to tolerable levels and allowed him to function on a daily basis. (*See, e.g.*, Tr. 558- medications reduced pain from 6/10 to 7/10 down to 4/10 on severity scale; Tr. 554- pain reduced from 8/10 to 3/10 to 5/10 with medications; Tr. 551- "pain medications work really well to help control his pain and when he is on his medication, his pain level is between 1-2/10 scale"; Tr. 543, 548- pain tolerable, especially on current medications to

---

[3]Several doctors did note clinical and objective findings such as weakness, reduced reflexes, and grip strength weakness, but these findings were noted prior to plaintiff's April 2008 cervical discectomy and fusion surgery. (Tr. 231, 234, 248, 265, 269).

where he can function on a daily basis).  The notes also show that at times of pain flare-ups, often plaintiff had been repetitively twisting and lifting at work or performing physical activity like working out or yardwork.  (Tr. 543, 549, 551, 562, 565).

Finally, the ALJ reasonably declined to give Dr. Shapiro's May 2014 opinion controlling weight because his assessment was not supported by the objective evidence.  Following plaintiff's April 2008 cervical discectomy and fusion surgery, post-surgical x-rays showed good alignment and an intact fusion, and a shoulder MRI was "essentially unremarkable."[4]  (Tr. 17, 586-590).  While an April 2010 EMG indicated "age indeterminate" C5-C6 radiculopathy on the left, the ALJ noted that this finding was not detected on an earlier EMG in 2007 and neural impingement from another herniated cervical disc was not confirmed by any subsequent imaging studies.  (Tr. 24).  The ALJ also commented that Dr. Shapiro never referred plaintiff for a neurological consult based on the EMG results and, therefore, "does not appear to have taken it seriously."  (Tr. 24).  This comment constitutes a medical judgment the ALJ is not qualified to make concerning whether Dr. Shapiro should have ordered additional imaging studies or referred plaintiff to a neurosurgeon.  *See Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006).  Nevertheless, the ALJ's other reasons cited above provide substantial support for the ALJ's decision to not give controlling weight to Dr. Shapiro's 2014 opinion despite the ALJ's unwarranted finding on the 2010 EMG.

For these reasons, the Court determines that the ALJ reasonably declined to give Dr. Shapiro's opinion controlling weight.  *See Gayheart*, 710 F.3d at 376.

---

[4] The objective findings cited by plaintiff in his statement of errors are from tests performed prior to plaintiff's neck surgery and do not reflect his condition post-surgery.  (See Doc. 8 at 13-14).

*Substantial evidence supports the ALJ's weighing of the regulatory factors*

Moreover, after declining to give Dr. Shapiro's opinion controlling weight, the ALJ conducted a thorough analysis of the regulatory factors in affording that opinion little weight. *See* 20 C.F.R. § 404.1527(c)(2)-(6). First, the ALJ noted the length and frequency of Dr. Shapiro's treatment relationship, but found this factor to be of limited value given that Ms. Pogue assumed the majority of plaintiff's treatment in June 2011 and her clinical findings did not support Dr. Shapiro's opinion. (*See* Tr. 25). As already explained above, Ms. Pogue's findings constituted substantial evidence that was inconsistent with Dr. Shapiro's May 2014 opinion. Second, the ALJ found that Dr. Shapiro failed to provide any specifics or quantitative measurements for his repeated citations to "somatic dysfunction found by range of motion asymmetries, tender points, and textural changes on osteopathic structural examination." (Tr. 25). *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."). In addition, Dr. Shapiro provided only conservative treatment— i.e., pain medication and osteopathic manipulations—for plaintiff's conditions prior to the date last insured. (Tr. 25). The Sixth Circuit has held that a plaintiff's limited treatment can constitute a "good reason" for rejecting a medical opinion that called for "severe functional limitations." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 806 (6th Cir. 2011) ("[T]he ALJ reasonably viewed Francis's limited treatment as inconsistent with Dr. Wakham's opinion. While Francis has been no stranger to a doctor's office, all of his recent treatments were conservative and largely confined to pain medications. . . . [This is] consistent with a finding that Francis's medications adequately manage his pain and enable him to work full time with some restrictions. This, again, is all that the substantial-evidence standard requires."). Third, the ALJ found that Dr. Shapiro's opinions as to plaintiff's functional limitations were not

supported by the medical evidence or consistent with Dr. Shapiro's own clinical findings prior to

plaintiff's date last insured. (*See* Tr. 25-26). As already explained, substantial evidence supports

the ALJ's finding in this regard. Additionally, the ALJ reasonably noted that Dr. Shapiro's

extreme limitations were inconsistent with the July 2013 findings of neurologist Arthur Hughes,

M.D., who examined plaintiff one year after his insured status expired and who reported a

negative Spurling's sign (a test to detect radicular pain) and found no weakness or incoordination

of the upper extremities. (Tr. 26, 398). Fourth, the ALJ reasonably determined that Dr. Shapiro

improperly assumed the role of vocational expert when he opined that plaintiff's lack of

vocational training and education would prevent him from functioning in the competitive

workplace. (Tr. 26, Tr. 517 ("[plaintiff] really just is not going to be competitive in the work

world"); Tr. 685 (plaintiff's neck and shoulder impairments "are impacting his ability to be in the

competitive workplace, given the amount of vocational training and education that he has had");

Tr. 683 (plaintiff "really does not have much training for anything other than physical work")).

"The ultimate conclusion of disability takes into account a myriad of factors, including

vocational factors, about which medical doctors typically have little knowledge, so that a general

opinion of disability is entitled to less weight than an opinion which is specifically couched in

terms of what work-related functions a claimant is capable of performing." *Daniels v. Comm'r

of Soc. Sec.*, No. 2:10-cv-760, 2011 WL 2110145, at \*3 (S.D. Ohio May 26, 2011). As the

conclusion of disability is one reserved to the Commissioner, Dr. Shapiro's opinion that plaintiff

lacks the education and training for competitive work is not entitled to any "special

significance." 20 C.F.R. § 404.1527(d)(1), (3). Finally, in considering the factor of

specialization, the ALJ determined that Dr. Shapiro's specialization in physical medicine and

rehabilitation was not "compelling." (Tr. 26). Although the undersigned disagrees with the

ALJ's conclusion in this regard[5], the ALJ's consideration of the other regulatory factors constitutes substantial evidence that supports the ALJ's decision to afford Dr. Shapiro's opinion little weight. *See* 20 C.F.R. § 404.1527(c)(2)-(4). *See also Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 241 (holding that substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."). Accordingly, plaintiff's second assignment of error should be overruled.

### 2. Substantial evidence supports the ALJ's assessment of plaintiff's credibility and RFC formulation.

At his hearing before the ALJ, plaintiff identified neck and back spasms, neck and shoulder pain, and left index finger numbness as preventing him from working. (*See* Tr. 779). Plaintiff testified that his pain was constant and was made worse by lifting, twisting, turning, climbing a ladder, or reaching for anything above his shoulders. (*See* Tr. 785). He testified that he needed to lay down once or twice a week for at least an hour because of pain. (*See id.*). He indicated that he could sit for four hours at a time, stand for one to two hours, walk about a mile, and lift anything less than 50 pounds. (Tr. 786). He had difficulty grabbing and holding objects, especially with his left hand. (*See* 786-87). Further, he testified that it was difficult for him to reach above his head, in front of him, or beside him. (Tr. 787). He was able to do the dishes,

---

[5] Contrary to the ALJ's finding that Dr. Shapiro's specialization in physical medicine and rehabilitation is not "compelling," that specialty is highly relevant to plaintiff's impairments. *See* Assoc. of Am. Med. Colls., *Physical Medicine and Rehabilitation*, https://www.aamc.org/cim/specialty/list/us/336862/physical_medicine_and_rehabilitation.html (last visited May 17, 2016) ("Physical medicine and rehabilitation . . . is the medical specialty concerned with diagnosing, evaluating, and treating patients with physical disabilities. These disabilities may arise from conditions affecting the musculoskeletal system such as birth defects, neck and back pain, sports injuries, or other painful conditions affecting the limbs . . . ."). *See also White v. Comm'r of Soc. Sec.*, No. 12-cv-12833, 2013 WL 4414727, at *20-21 (E.D. Mich. Aug. 14, 2013) (ALJ reasonably relied on the opinion of a specialist in physical medicine and rehabilitation); *Bundy v. Comm'r of Soc. Sec.*, No. 2:11-cv-64, 2012 WL 10303, at * 6 (S.D. Ohio Jan. 3, 2012) (Report and Recommendation) (King, M.J.), *adopted*, 2012 WL 272734 (S.D. Ohio Jan. 27, 2012) (Sargus, J.) (concluding the ALJ failed to properly evaluate the opinion of a specialist in physical medicine and rehabilitation where it was "not clear that any of the physicians upon whose opinion the [ALJ] relied [were] comparably qualified"); *Yates v. Comm'r of Soc. Sec.*, No. 3:07-cv-47, 2008 WL 886136, at *9 (S.D. Ohio Mar. 28, 2008) (concluding the ALJ reasonably placed greater weight on a non-treating specialist in physical medicine and rehabilitation than on a family medicine physician).

vacuum, clean, do laundry, take out the trash, and mow the lawn. (*See* Tr. 789-90). Plaintiff clarified that the heaviest thing he could pick up and carry was a ten-pound bag of trash, but he could "move a little couch or move a little furniture to one side, to the other, something like that." (Tr. 793).

The ALJ found that through plaintiff's date last insured, he retained the RFC to perform light work with the following restrictions: (1) plaintiff's use of the left upper extremity was limited to occasional pushing/pulling, occasional overhead reaching, frequent front and lateral reaching, and frequent handling, fingering, and feeling; (2) he could never crawl and never climb ladders, ropes, or scaffolds; (3) he could frequently climb ramps or stairs, balance, stoop, kneel, and crouch; (4) he needed to avoid all exposure to workplace hazards; (5) he was limited to performing simple, routine, and repetitive tasks; (6) he was not able to perform at a production rate pace, but could perform goal-oriented work; (7) he was limited to making simple, work-related decisions; (8) he could have frequent, superficial interaction with supervisors and coworkers, but no interaction with the public; and (9) he was limited to tolerating occasional changes in a routine work setting. (Tr. 20).

In assessing this RFC, the ALJ gave "little consideration" to plaintiff's allegations concerning the intensity, persistence, and limiting effects of his symptoms, finding that plaintiff was not fully credible. (Tr. 20-21). The ALJ concluded that plaintiff's testimony concerning the disabling degree of his pain was not consistent with medical findings that his anterior cervical discectomy and fusion had resolved many of his functional limitations. (*See* Tr. 21). Further, the ALJ found that plaintiff's testimony concerning the severity of his pain was "simply not credible" given that his treatment after the cervical spine surgery was conservative. (Tr. 22). The ALJ also found that plaintiff's overall credibility was "eroded by evidence in the medical record of noncompliance and substance abuse." (*Id.*).

Plaintiff argues the ALJ improperly evaluated his subjective complaints of pain. (*See* Doc. 8 at 6-8). Plaintiff contends that objective test results supported his complaints of pain and his symptoms were "persistent and consistent" following his 2008 cervical spine surgery. (*Id.* at 9-10). Plaintiff argues the ALJ improperly speculated that plaintiff's 2010 EMG findings were not serious because Dr. Shapiro did not refer him to a neurosurgeon. (*Id.* at 9). Plaintiff contends the ALJ improperly discredited his testimony based on evidence of marijuana use because plaintiff was honest with his physicians about his marijuana use. (*Id.* at 16). Plaintiff argues the issue of marijuana use is not material in his case because he is alleging disability as a result of physical impairments. (*Id.* at 17).

The Commissioner responds that the ALJ did not have an obligation to re-contact Dr. Shapiro for clarification of his decision not to refer plaintiff to a neurosurgeon after the 2010 EMG. (Doc. 13 at 15-16). The Commissioner argues the ALJ properly assessed plaintiff's RFC after appropriately giving some weight to the opinions of the non-examining state agency physicians. (*Id.* at 17-18). The Commissioner contends the ALJ gave plaintiff "the benefit of the doubt" by assessing more restrictive limitations than those the state agency physicians recommended. (*Id.* at 18-20). The Commissioner argues that substantial evidence supports the ALJ's credibility determination, including unremarkable physical examinations, substance abuse, and activities of daily living. (*Id.* at 20-24).

In reply, plaintiff argues that "Dr. Shapiro's narrative report makes clear that the reason that Dr. Shapiro did not refer Plaintiff to a neurosurgeon, or for physical therapy, or any other more intense course of treatment, is that there were difficulties with getting the Bureau of Workers Compensation to approve such further treatment." (Doc. 15 at 6). Plaintiff contends the ALJ's credibility finding is not supported by substantial evidence because he was always honest about his marijuana use "so there is no reason to equate his use of marijuana with poor

27

credibility." (*Id.* at 7). Plaintiff argues his activities of daily living are not a proper basis for discrediting him because his "pain only went . . . low on a few occasions, and only when he was not active. Even working part-time considerably increased [his] pain levels." (*Id.*).

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton*, 246 F.3d at 773; *Kirk v. Sec'y of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Subjective complaints of pain and other symptoms are evaluated under the standard set forth in *Duncan v. Sec'y of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. *Id.* at 853. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of the pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Id.*

In addition to the objective medical evidence, the Commissioner must consider the opinions and statements of the plaintiff's doctors. *Felisky*, 35 F.3d at 1040. Additional specific factors relevant to the plaintiff's allegations of pain include her daily activities; the location, duration, frequency, and intensity of her pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication plaintiff takes to alleviate her pain or other symptoms; treatment other than medication plaintiff has received for relief of her pain; and

any measures the plaintiff uses to relieve her pain. *Id.* at 1039-40; 20 C.F.R. § 404.1529(c). Although plaintiff is not required to provide "objective evidence of the pain itself" in order to establish she is disabled, *Duncan*, 801 F.2d at 853, statements about her pain or other symptoms are not sufficient to prove disability. 20 C.F.R. § 404.1529(a). The record must include "medical signs and laboratory findings which show that [plaintiff has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that [plaintiff is] disabled." *Id.*

Here, substantial evidence supports the ALJ's finding that plaintiff's statements regarding the intensity, persistence, and limiting effects of his pain symptoms were not fully credible. (*See* Tr. 20-21). The ALJ reasonably concluded that plaintiff's testimony regarding the disabling degree of his pain was not consistent with the medical record. For example, Ms. Pogue noted in February 2011 that plaintiff "says the medication works very well" and "decreases the pain from 6/10 to 7/10 down to 4/10 on the severity scale." (Tr. 558). In June 2011, plaintiff reported that his pain symptoms were "tolerable on the current medications that he is on for pain management." (Tr. 555). In July 2011, plaintiff reported that he was doing well on his medications, which reduced his pain from 8/10 to as low as 3/10. (Tr. 554). In October 2011, after Ms. Pogue added an additional anti-inflammatory medication to plaintiff's medication list, he reported that his medications reduced his pain level to as low as 1/10. (*See* Tr. 551-52). In February, April, and June 2012, plaintiff reported that "the pain medications help control the pain to where he can function on a daily basis without any type of side effects." (Tr. 543, 545, 547). In addition to this evidence that plaintiff's pain was not as severe as he alleged, the ALJ also reasonably noted that the alleged severity of his symptoms was belied by his conservative treatment regimen prior to his date last insured. (*See* Tr. 22); *see Francis*, 414 F. App'x at 806.

Furthermore, the ALJ was entitled to discount plaintiff's testimony as to the severity of his symptoms based on plaintiff's noncompliance with Dr. Shapiro's orders and the pain management agreement. In May 2012, Ms. Pogue noted that plaintiff's drug screen result was positive for hydrocodone, which had not been prescribed. (Tr. 544). Ms. Pogue informed plaintiff that this was "noncompliance and [was] unacceptable," and plaintiff "verbalized understanding and assured [her] this will not be a problem in the future." (*Id.*). However, plaintiff's drug screen results were again positive for hydrocodone and/or marijuana at subsequent appointments. (*See* Tr. 534, 539). Thus, "plaintiff's admitted failure to follow [his] doctor's advice to avoid smoking marijuana supports the ALJ's credibility determination." *Payne-Hoppe v. Comm'r of Soc. Sec.*, No. 1:11-cv-97, 2012 WL 395472, at *14 (S.D. Ohio Feb. 7, 2012) (Report and Recommendation) (Litkovitz, M.J.), *adopted* 2012 WL 709274 (S.D. Ohio Mar. 5, 2012) (Beckwith, J.). *See also Bell v. Comm'r of Soc. Sec.*, No. 14-cv-13390, 2015 WL 4545975, at *12 (E.D. Mich. Jul. 28, 2015) ("Noncompliance is a sufficient reason to discount credibility."); *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (concluding the ALJ properly discounted the claimant's credibility where he failed to follow prescribed treatment).

Based on the foregoing, substantial evidence supports the ALJ's credibility determination. Likewise, substantial evidence supports the ALJ's decision not to impose more severe RFC restrictions based on plaintiff's allegations of disabling pain. Accordingly, plaintiff's first and third assignments of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED**.

Date: _5/31/16_

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHNEL A. LOVE,                                 Case No. 1:15-cv-408
    Plaintiff,                                  Barrett, J.
                                                Litkovitz, M.J.
   vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).